IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In the Matter of: | ) | Case No. BK 26-40156 |
| | ) | |
| NEBRASKA PEACE OF MIND BEHAVIORAL HEALTH, LLC, | ) | Chapter 11 Subchapter V |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Order Regarding Confirmation**

THIS MATTER came before the court on August 12, 2026, for confirmation of the Subchapter V plan filed by Nebraska Peace of Mind Behavioral Health, LLC. This order supplements the text order at Doc. #54, and to the extent inconsistent, alters and amends it.

The unsecured creditor class, which holds claims totaling $323,188.76, is the only class that voted against confirmation. Therefore, § 1129(a)(8) is not met and confirmation is available only under § 1191(b).

Even though no one filed an objection to the plan, the court has an independent duty to determine whether every element necessary for confirmation is met. For the reasons stated below, not all requirements are met. The debtor must file a proposed modification or an amended plan.

*Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)*

The debtor's plan cannot be confirmed because it does not meet the best interests of creditors requirement of 11 U.S.C. § 1129(a)(7). The unsecured creditor class would be better off in a Chapter 7 liquidation. The tension is between the liquidation value of the debtor's assets and the debtor's projected disposable income. Simply stated, and relatively speaking, the debtor is "asset rich" but on an operating basis is projected to be "cash poor."

On the asset side, the debtor's plan projects the unsecured creditor class would receive $54,810.95 in a hypothetical Chapter 7 liquidation, after paying Chapter 7 trustee fees and expenses. On the operating side, the plan

projects $37,374 in disposable income under § 1191(c)(2) and (d) over the plan's three-year term.[1]

Accepting these numbers as accurate, the unsecured creditors would receive an additional $17,436.95 in liquidation. To handle the shortfall, the debtor proposes to pay the unsecured creditors $17,436.88 on the effective date of the plan.[2] The debtor then proposes to pay the remaining $37,374 in twelve quarterly payments of $3,114.50. Payments are made to the Subchapter V trustee, who will administer the funds and distribute them. The trustee will deduct her compensation from the payments.

Under the best interests of creditors test, unless the holder of an impaired claim has accepted the plan, the holder must:

> receive or retain under the plan on account of such claim . . . property of a value, *as of the effective date of the plan*, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7). The effective date of the plan is 14 days after the order confirming the plan becomes a final order.

The words "as of the effective date of the plan" require the payment stream be discounted to present value when comparing it to the liquidation value.

> Generally, money now is worth more than money later. Accordingly, future payments must be discounted before adding them up to see whether the total equals the present value of a claim. Discounting is achieved by applying an interest rate that captures the time value of money—often called the "discount rate."

*Farm Credit Servs. of Am. v. Topp (In re Topp)*, 75 F.4th 959, 961 (8th Cir. 2023) (citations omitted).

The debtor did not discount the future payments. After the $17,436.88 payment, using the plan's numbers, the unsecured creditors are entitled to

---

[1] Plan Exhibit B contains the projected disposable income calculations. The monthly net cash flow in the exhibit totals $37,379, not the $37,374 stated in the body of the plan. This inconsistency in the plan shorts the unsecured creditors $5.00.

[2] Technically, the plan fails on its own arithmetic, however nominal. The proposed payment shorts the unsecured creditors $0.07, not considering any present value concerns. The $0.07 is the difference between the $17,436.95 stated shortfall and the $17,436.88 proposed payment.

$37,374.07 as of the effective date. The quarterly $3,114.50 payment multiplied by 12 equals $37,374. This is a discount rate of 0%. Added to the $17,436.88 payable on the effective date, the plan distributes $54,810.88 over three years. At a discount rate of 4%, which is close to the current Treasury rate,[3] the present value of the deferred payments is $35,053.94.[4] The Subchapter V trustee will further reduce that amount by deducting trustee's fees and expenses, making the shortfall between plan payments and the liquidation value even larger.[5]

The debtor responded at the hearing that unsecured creditors are not entitled to interest on their claims. This argument misses the point. Discounting a future income stream to present value does not allow or pay interest. It merely recognizes "money now is worth more than money later." *Id*. The debtor's argument assumes the unsecured creditors have a claim in the amount of $54,810.95. They do not. The unsecured claims total $323,188.76. $54,810.95 is the minimum amount the plan must pay as of the effective date of the plan to meet the best interests of creditors test.

The plan is not confirmable unless it is modified to deliver unsecured creditors, *as of the effective date*, value of not less than $54,810.95, net of the Subchapter V trustee's compensation.[6]

---

[3] This does not suggest either 4% or the Treasury rate is the appropriate discount rate in this case. The rate is used solely to show the effect discounting the payments has on the unsecured creditors. The choice of rate does not affect the outcome. The plan falls short at every positive discount rate.

[4] For those who did not take a theory of interest class or two, the calculation for the present value of an ordinary annuity is $PV = R[1-(1+r/n)^{-nt}] / (r/n)$, where PV is the present value, R is the periodic payment, r is the annualized rate, n is the compounding frequency per year, and t is the number of years. Applying the plan's terms and the 4% discount rate: $\$35,053.94 = \$3,114.50 \text{ x } [1-(1+.04/4)^{-(4*3)}] / (.04/4)$. At the 4% discount rate, the debtor pays unsecured creditors $52,490.82 against a $54,810.95 floor, or a $2,320.13 shortfall before trustee fees.

[5] To be fair, the liquidation value is also in undiscounted dollars. But the burden is on the debtor. The debtor offered no evidence of when a Chapter 7 trustee would distribute payments from the hypothetically liquidated assets.

[6] Assuming projected disposable income is fully committed, the additional dollars must come from existing cash, an owner or third-party contribution, asset sales, or an accelerated payment schedule.

*Owner Compensation and Projected Disposable Income*

The debtor's plan also cannot be confirmed because the debtor's projected disposable income is uncertain on the record presented. As the plan proponent, the debtor bears the burden of establishing every confirmation requirement. This includes establishing projected disposable income under § 1191(c)(2) is correctly calculated. The uncertainty also bears on feasibility under § 1129(a)(11) and on the adequacy of insider-compensation disclosure under § 1129(a)(5)(B), each of which is addressed below.

In calculating projected disposable income, the debtor is allowed certain deductions. One deduction is "expenditures necessary for the continuation, preservation, or operation of the business of the debtor." 11 U.S.C. § 1191(d)(2). The deductions must be disclosed and sufficiently explained. The debtor's projected disposable income includes three compensation line items. The first is "W2 Payroll" of $27,273 per month, or $327,276 per year. The second is "Owner Compensation (Draws)" of $8,000 to $10,000 per month, or $96,000 to $120,000 per year. The third is "1099 Providers" of between $163,200 and $176,800 per month.

Article III of the plan discloses the debtor's ownership and management. The debtor has three owners. Two will be paid for management services. Sam Hasan is listed as "Manager / Owner / Therapist." Diana Hasan is listed as "Chief Operating Officer." Beyond their titles, the plan does not describe the scope of the services the Hasans will provide. Nor does it provide any basis for concluding whether their compensation is reasonable. The plan does not delineate the time Mr. Hasan will devote to the business from the time he will devote as a therapist to clinic work. And the plan does not state whether Mr. Hasan will be paid any part of the 1099 Providers line, and if so, how much. Section 1129(a)(5)(B) requires that disclosure.

For their management services, Article III provides Mr. Hasan will be paid $112,800 annually. Ms. Hasan will be paid $21 per hour on a full-time basis, which is $43,680 annually assuming a 2,080-hour work year. Total disclosed management compensation is approximately $156,480 per year, or $13,040 per month. But nothing in the plan or the disposable income projections explains which line, W2 Payroll or Draws, pays the management compensation.

The ambiguity matters. The result is three possible readings, each of which presents a different problem.

*First Reading*: Article III compensation is entirely paid through W2 Payroll. Under this reading, $156,480 of the $327,276 annual payroll—roughly 48%—

is paid to two of the debtor's three owners. On top of this the three owners would be paid $96,000 to $120,000 in owner distributions from the Draws. This would not be reasonable compensation for services under § 1191(d)(2). And it would impermissibly and significantly reduce projected disposable income.

*Second Reading*: Article III compensation is entirely paid through Draws. Under this reading, the debtor's plan is underfunded. Disclosed management compensation of $13,040 per month exceeds the $8,000 to $10,000 draw by $5,040 per month at the $8,000 level and $3,040 per month at the $10,000 level. Understating the expense overstates the disposable income. This would mean the debtor cannot pay all required payments and the plan is not feasible under 11 U.S.C. § 1129(a)(11).

*Third Reading*: Mr. Hasan is paid from Draws and Ms. Hasan is paid from W2 Payroll. Under this reading, Mr. Hasan's $112,800 in annual compensation is $9,400 per month. The Draws amount is $8,000 per month through December 2026, a shortage of $9,800 in 2026. The Draws amount increases to $10,000 per month from January 2027 through July 2029. At $8,000, Draws cannot cover Mr. Hasan's compensation. At $10,000, the draw leaves $600 per month of additional projected disposable income available, $18,600 over the plan term.

Under every reading the numbers are not reconciled. The amounts are not small. In January 2027, the Draws increase by $2,000 per month. Projected net cash flow falls the same month from $3,154 to $384. The draw increase accounts for $2,000 of the $2,770 decline. Holding the draw at $8,000 would add approximately $62,000 to projected disposable income over the life of the plan. This is substantially more than the $37,374 the plan proposes to pay the entire unsecured class. Over the three-year plan term Draws alone total $288,000 to $360,000. Projected disposable income for the same period is $37,374. The Draws to insiders are roughly eight to ten times the entire distribution to the class of unsecured creditors.[7]

Reasonable compensation for services actually rendered is an operating expense and reduces disposable income. Distributions on account of equity do not. The debtor bears the burden of establishing which is which. The debtor has not met it. As a result, it is not possible to determine whether projected disposable income is correctly calculated under § 1191(c)(2) and (d). And it is

[7] The relationship between the proposed payments to owners and the proposed distribution to unsecured creditors may bear on whether the plan was proposed in good faith under § 1129(a)(3), and the debtor should also be prepared to address the question at the continued hearing.

not possible to find insider compensation is adequately disclosed under 11 U.S.C. § 1129(a)(5)(B).

If the debtor files a modification, it must reconcile these figures. It must state what each owner is paid, whether that payment is included in W2 Payroll, in Draws, or in 1099 Payments, and what services are provided in exchange. If any portion of Draws is a distribution on account of equity rather than compensation for services, the projections must be revised to add that amount back to disposable income.

**Conclusion**

The debtor's plan cannot be confirmed as drafted. But it is possible the plan can be modified to conform with the statutory requirements.

IT IS THEREFORE ORDERED: The debtor may modify the plan under § 1193(a) to attempt to cure the defects noted above.[8] The modification must be filed by August 26, 2026, and must be served on the full court mailing matrix. If the modification does not adversely change the treatment of any claim, prior acceptances and rejections are deemed to apply to the modified plan and re-balloting is not required. *See* Fed. R. Bankr. P. 3019(a). If a modification is not timely filed, confirmation will be denied without further hearing and the debtor will be ordered to file an amended plan. Cause is found to allow any creditor wishing to change its vote to do so in writing submitted before the hearing. *See* Fed. R. Bankr. P. 3018(a).

IT IS FURTHER ORDERED: The confirmation hearing remains set for August 31, 2026, at 11:00 a.m. The debtor may request a continuance in light of this order.

Dated: August 17, 2026

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Chief Bankruptcy Judge

[8] The filed modification may include but does not have to include the entire plan. It may include only the modified plan sections or attachments.